IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 18, 2022

## EMOGENE ROBINSON, A DISABLED INDIVIDUAL, BY AND THROUGH HER DULY APPOINTED CONSERVATOR, UPPER CUMBERLAND DEVELOPMENT DISTRICT, OFFICE OF THE PUBLIC GUARDIAN, LYNN DAWSON v. DONNA HICKS, ET AL.

**Appeal from the Chancery Court for DeKalb County**
**No. 2021-CV-73     Ronald Thurman, Chancellor**

—————————————————————

**No. M2022-00960-COA-T10B-CV**

—————————————————————

This is an accelerated interlocutory appeal from the denial of a motion for disqualification of the trial judge. After carefully reviewing the record provided by the parties, we affirm the decision of the trial court denying the motion.

**Tenn. S. Ct. R. 10B Interlocutory Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which W. NEAL MCBRAYER and KRISTI M. DAVIS, JJ., joined.

G. Frank Lannom, Elizabeth Stovall, and Donnavon Vasek, Jr., Lebanon, Tennessee, for the appellant, Donna Hicks.

Daniel Hurley Rader, IV, and André S. Greppin, Cookeville, Tennessee, for the appellee, Emogene Knowles Robinson, by and through her duly appointed Conservator, Upper Cumberland Development District, Office of the Public Guardian, Lynn Dawson, Public Conservator.

## OPINION

### I.  FACTS & PROCEDURAL HISTORY

The allegation of bias in this case stems from the fact that the trial judge presided over a previous case – *In the Matter of the Conservatorship of Emogene Knowles Robinson*. Thus, we will begin with a discussion of that case. The conservatorship proceeding began

when Randy Knowles filed a petition for appointment of a conservator for his mother, Emogene Knowles Robinson. The petition was filed in the chancery court of DeKalb County and alleged that Mrs. Robinson resided in Smithville, Tennessee. Mr. Knowles resided in Brentwood, Tennessee, and sought to be designated as conservator for his mother on the basis that she was disabled, suffering from dementia, and in need of assistance. According to the petition, Mrs. Robinson's next-of-kin also included her 85-year-old husband and a daughter, Donna Hicks, who lived in Lebanon, Tennessee. However, the petition asserted that Mrs. Robinson's husband had suffered a stroke and that her daughter was a convicted felon who had three felony convictions for money laundering. The petition stated that a doctor had determined that Mrs. Robinson should no longer be making financial or medical decisions, and Mr. Knowles had been previously designated as her power of attorney. However, it alleged that Ms. Hicks had attempted to have the power of attorney revoked and sought to gain access to their mother's accounts, which led to a bank representative becoming suspicious and notifying him of the situation. Mr. Knowles asserted that Mrs. Robinson was at "great risk of financial abuse" and that she owned several real properties valued at several million dollars. An attached physician's report indicated that Mrs. Robinson was in her eighties and suffering from progressive dementia and other conditions, and that her neurologist recommended that her son handle her finances.

A hearing was held before Chancellor Ronald Thurman on May 12, 2021, regarding a request for an emergency temporary conservator pending the final hearing. The trial court heard testimony from a single witness – James Milford, who was employed by Regions Bank as "corporate security investigator for Southwest Florida." Mr. Milford testified that he had received a report of "elder abuse/exploitation" from a banker in Fort Myers. The report indicated that "there was a discrepancy" between Ms. Hicks and her mother in front of the banker in regard to a withdrawal from Mrs. Robinson's checking account. Mrs. Robinson reportedly requested to withdraw $500, but "Ms. Hicks interjected herself into the conversation with the banker and told her, no, three, we want $3,000." There was a discussion and disagreement between Ms. Hicks and Mrs. Robinson, which "escalated . . . as . . . Mrs. Hicks became a little bit loud with her mother in regards to how much money should be taken out," so the banker "separated the parties" in order to ask Mrs. Robinson how much money she wanted. She then confirmed $500. Mr. Milford explained that tellers are trained to recognize aspects of elder abuse or exploitation "when someone takes over the conversation who's not on the account" and followed policy by reporting it to corporate security. He said he contacted Ms. Hicks by telephone and informed her that the bank would now be monitoring the account and researching to determine whether any previous activity appeared suspicious. He testified that Ms. Hicks then advised him that she had moved her mother from Tennessee to Florida to a condo they owned in the area and that there had been some expenses for the condo. According to Mr. Milford, Ms. Hicks also told him that she had moved her mother from Tennessee to Florida because her mother "was subject to being institutionalized by the family." Mr. Milford advised her that if his investigation revealed anything suspicious, he would be contacting

appropriate agencies and/or law enforcement.

Mr. Milford testified that he subsequently "did a deep dive into Mrs. Robinson's account and determined that there was a total of … $800,000 that was attempted to be removed" and deposited into the bank in Fort Myers. He said $500,000 of that sum "did go through" but another check for $300,000 did not, and the accounts were now "frozen." Mr. Milford said there was "no doubt" in his mind that Ms. Hicks was acting on behalf of Mrs. Robinson and "in control of the finances." He had reviewed some video footage of Ms. Hicks accompanying Mrs. Robinson to the bank but other footage where Ms. Hicks appeared at a bank by herself. Mr. Milford said he had experience with "elder-abuse-type situations," as he was a retired law enforcement officer who had worked in the financial crimes unit of the United States Secret Service. In his opinion, this situation was consistent with elder abuse, and he concluded that there was probable cause to report the situation to the Department of Children and Families in Florida, which is responsible for investigating elder abuse and elder exploitation cases. He testified that he made the report and that the agency had opened an investigation.

The guardian ad litem for Mrs. Robinson, who happened to be a former district attorney, also supported the petition and expressed "great concern that Ms. Hicks is committing criminal acts." The trial court entered a written order thereafter stating that it heard testimony from an "uninterested witness" establishing that Mrs. Robinson had been removed from this state in an effort to take her out of the jurisdiction of the court. The order stated that Mrs. Robinson "shall be returned to the State of Tennessee" and that all funds withdrawn from her accounts from April 22 through May 5 shall be returned and deposited with the clerk and master. Rather than Mr. Knowles, however, the trial court found that "appointment of a temporary public conservator is necessary," and it appointed the Upper Cumberland Development District, Office of the Public Guardian. A private attorney had been retained to represent Mrs. Robinson and oppose the appointment of a conservator, and the order states that the trial court would allow the attorney to deposit with the clerk and master a check he had received from Mrs. Robinson, although the court noted that it was "not concluding that [Mrs. Robinson] was competent to do that at the time."

The final hearing on the petition for a conservator was held on July 23, 2021. Neither Mrs. Robinson nor Ms. Hicks was present for trial. The transcript from the previous hearing, with the testimony of Mr. Milford, was admitted as an exhibit at trial. A clinical neuropsychologist, Daniel Malcolm Spica, Ph.D., testified about his neuropsychological examination of Ms. Robinson before she was removed from this State. He described his interaction with Mrs. Robinson as follows:

Q.      If you could tell the Court what happened when you arrived at [Mrs. Robinson's attorney's] office when you entered the conference room.
A.      Well, I was introduced to the examinee, Mrs. Robinson, and her

- 3 -

daughter, Donna Hicks . . . . When I entered the conference room, well, the examinee, I met her and she said that she was being tutored by her daughter and they were, they were going over some questions and how Mrs. Robinson should answer.

Q. And did, was there any writing that you obtained?

A. Yes. Mrs. Robinson handed to me the sheet of paper that she was using, as she said, to study.

Q. And do you have that with you?

A. I do.

. . . .

Q. And if you can explain to the Court what's on this document.

A. Well, it's, it's a handwritten document. At the top, it says, Age, 83 years old.

. . . .

Q. And then under it, it has no conservator underlined with exclamation points?

A. Yes, underlined multiple times, no conservator, yes.

He went on to describe other items listed on the document, including the name of Ms. Hicks beside "power of attorney" and a statement that she had taken care of Mrs. Robinson's business for thirty years, along with another statement that Mr. Knowles was "going to lock me up and took my money."

Dr. Spica testified that he administered the Dementia Rating Scale to Mrs. Robinson and concluded that she was suffering from "more advanced" dementia. Out of five subtests he administered, she scored at or below the first percentile on all five, meaning that 99 percent of the population scored better than she did. She had similar scores and other tests and was found to be severely or profoundly impaired with major neurocognitive disorder. A cognitive battery test showed that "her current intellectual ability is commensurate with that of a 5-year-old child."

Mr. Knowles also testified. He had only recently learned that his mother executed a will days after the conservatorship proceeding began, leaving all of her estate to Ms. Hicks, along with four quitclaim deeds conveying her real properties to Ms. Hicks as well. Mrs. Robinson's granddaughter also testified, as she had, at some point, joined in the petition for a conservator. The trial judge announced his oral ruling at the conclusion of the testimony and found by the "overwhelming" weight of the evidence that Mrs. Robinson was in need of a conservator. He found that Dr. Spica, Mr. Knowles, and the granddaughter were all very credible witnesses. He also found the bank fraud investigator, Mr. Milford, "extremely credible," and based on his testimony, found that Ms. Hicks had "taken her momma and fled . . . to Florida to avoid these proceedings." The trial judge found that "Ms. Hicks, in the Court's mind, has been a predator here," adding "I don't know any other way to, that I could qualify it other than that. That was the clear import that this Court got

from it based on his observations . . . where they were . . . at the bank and they were arguing in front of a teller about how much money to take out." The judge noted that Ms. Hicks had appeared at the bank on many dates with checks in excess of a hundred thousand dollars, which, "in the Court's mind, [] this is predatory behavior." The trial judge concluded that Mrs. Robinson was not capable of handling affairs and that she was not competent at the time the various transfers were made, such that they should be set aside. He added,

> I suspect that the Conservator will file an appropriate lawsuit to bring the daughter into this case. I'm – I'm going to keep the Public Conservator on this, not because I found that petitioners are inqualified [*sic*], but I think they're in a better situation right now to deal with this and if there's been moneys absconded with, they have the capabilities of moving forward, and if there needs to be prosecution, I think they can take whatever steps necessary. The Public Conservator has all the rights available under the statute.

Later that day, after the oral ruling on July 23, 2021, the public conservator filed a separate lawsuit on behalf of Mrs. Robinson against Ms. Hicks and her husband, asserting nine claims for relief: violation of the Tennessee Adult Protection Act; conversion; undue influence; fraud; diminished capacity; declaratory judgment; ejectment; false imprisonment; and civil conspiracy.

The written order in the conservatorship proceeding was entered on August 17, 2021. Consistent with its oral ruling, the court found by clear and convincing evidence that Mrs. Robinson was a vulnerable and disabled person who was incapable of caring for herself and her property and that a conservator should be appointed for her person and property. The court credited the testimony of Dr. Spica that Mrs. Robinson functions at the capacity of a five-year-old, suffers from major neurocognitive disorder, and is incapable of managing herself and her property. The court found that Ms. Hicks had removed Mrs. Robinson to Florida after the results of Dr. Spica's testing were disclosed. It found that Ms. Hicks moved Mrs. Robinson to Florida in order to avoid the court proceeding, using scare tactics and falsely stating to Mrs. Robinson that Mr. Knowles had taken her money and was trying to institutionalize her. It described the testimony of the bank fraud investigator that "the actions of Donna Hicks were consistent with financial abuse and exploitation of [Mrs. Robinson]," including the argument in a Florida bank in which Ms. Hicks wanted to withdraw more money than Mrs. Robinson, and the two "had to be physically separated." It noted the testimony of Mr. Milford that Mrs. Robinson was clearly acting under the direction and control of Ms. Hicks. It found that Ms. Hicks had attempted to relocate $800,000 from Mrs. Robinson's account, and $500,000 was actually transferred, but it was now held by the clerk and master. Considering the testimony of Dr. Spica regarding Mrs. Robinson's mental condition, the court found that Mrs. Robinson was incompetent to engage in these transactions, that Ms. Hicks was responsible for moving

- 5 -

the money into an account in which she was beneficiary, and she had Mrs. Robinson sign checks as part of a scheme for transferring Mrs. Robinson's assets to her. It found that Mrs. Robinson was fully disabled and in need of the court's protection. The court noted that Mrs. Robinson had not returned to Tennessee and was still under the direction and control of Ms. Hicks in Florida. The court noted the recent discovery of the quitclaim deeds and will Mrs. Robinson executed during the conservatorship proceeding, although the deeds were not recorded or provided during discovery until a motion to compel was filed shortly before trial. The court found that Mrs. Robinson was not competent to execute these documents and that they should be set aside for lack of competency and undue influence. Finally, the order stated:

> The Court finds that the actions of Donna Hicks were predatory and that this Court specifically authorizes the Conservator to take whatever steps as is necessary toward prosecution or litigation to return [Mrs. Robinson] to Tennessee to her husband and family and to recover [her] assets that have been taken from her.
> . . . .
> Though the Court is to consider family members under Tennessee law in the appointment of a conservator, however, the Court hereby appoints the Upper Cumberland Development District, Office of the Public Guardian (UCDD/OPG), and its agents . . . not because the Petitioners have done anything wrong but because the Court finds that the Public Conservator has the resources and is in the best position to get [Mrs. Robinson] home to her Tennessee family, other than Ms. Hicks and her immediate family, and to recover [Mrs. Robinson's] assets that have been taken from her by Ms. Hicks. All rights shall be removed from [Mrs. Robinson] and transferred to the Public Conservator as provided in T.C.A. § 34-3-107 *et seq.* . . .

Again, this final order was entered in the conservatorship proceeding on August 17, 2021.

Four months later, on December 22, 2021, Ms. Hicks filed a petition to intervene in the conservatorship proceeding. Her petition noted that the final hearing had been held on July 23, 2021, and the trial court had found that the deeds and will executed by Mrs. Robinson should be set aside. Ms. Hicks argued that she had a substantial interest in the will and deeds and that she was unable to protect her interests because she was not a party to the conservatorship proceeding. She also noted that those issues were currently the subject of another pending lawsuit – the civil suit filed against her by the conservator on July 23. Ms. Hicks argued that it would be unjust to deprive her of the opportunity to intervene, at least with respect to the portion of the order regarding the will and deeds.

The trial court held a hearing on the petition to intervene on January 28, 2022, along with a motion to alter or amend filed by Mrs. Robinson's private counsel. It denied the motions by written order on March 15, 2022. The order reiterated that the court had found

- 6 -

by clear and convincing evidence that Mrs. Robinson lacked capacity and that Ms. Hicks had exercised undue influence over her. The court referenced the testimony of Mr. Milford that Ms. Hicks "admitted she moved her mother to Florida because [she] was being subjected to the possibility of being institutionalized by her family, which was an obvious reference to the conservatorship proceeding pending before this Court." Thus, the court found it undisputed that Ms. Hicks moved Mrs. Robinson to Florida "to avoid this litigation and keep her away from the Court." The court recounted the testimony that Ms. Hicks took Mrs. Robinson to several banks to withdraw money from her accounts and that a bank teller had "alerted the corporate security department of possible elder abuse and exploitation, due to Donna Hicks injecting herself into Mrs. Robinson's conversation and instructing the teller that Mrs. Robinson wanted to withdraw more money." It found that Ms. Hicks controlled access to Mrs. Robinson and that Mrs. Robinson's "private counsel" had to call Ms. Hicks in order to speak with Mrs. Robinson. The court found that the will was executed one week after the petition for a conservator was filed, and the deeds were executed shortly thereafter, with Ms. Hicks being the sole beneficiary of those instruments and personally involved in procuring them. The court found that the parties were on notice that the will would be at issue at trial because it was discovered shortly before trial and the subject of a motion to compel. It stated that the proof at trial had been clear and convincing that Mrs. Robinson did not have the capacity to understand the nature of her property or these dispositions of it, Ms. Hicks took advantage of Mrs. Robinson's vulnerable condition and exercised dominion and control over her, and she substituted her will for that of Mrs. Robinson. In fact, the court noted, this was "one of the worst cases of predatory behavior that the Court has seen in sixteen (16) years on the bench."

Ultimately, the court concluded that the petition to intervene should be denied as untimely. It found that Ms. Hicks had been "involved in this case from the very beginning," as she procured the execution of the deeds and will immediately after it was filed, and her own attorney provided copies of the deeds in response to the motion to compel, yet she did not seek to intervene at that time, prior to trial. Instead, the court noted, she waited until four months after the entry of the written order to seek to intervene. The court pointed out that Ms. Hicks did not claim any lack of knowledge of the final order, and it noted that it would not find such a claim credible if she did, in light of the facts that other members of her family attended the court proceedings while she remained in Florida, and counsel for Mrs. Robinson was observed making telephone calls during breaks in order to discuss what had happened in court. The court found that Ms. Hicks knew or should have known of her claimed interest in the litigation and should have sought to intervene prior to trial. It found she was barred by the doctrine of laches from attempting to intervene at such a late date and denied her motion as untimely.

Additionally, the court found that her motion to intervene should be denied on the basis of unclean hands, as she had willfully engaged in inequitable conduct with regard to the matters at issue in the case by procuring the instruments conveying all of Mrs. Robinson's assets to herself, taking her mother to Florida under false pretenses, removing

hundreds of thousands of dollars from her accounts, and failing to return Mrs. Robinson to Tennessee on the ground that she was not a party and not subject to the jurisdiction of the court. In short, the court found that Ms. Hicks had taken control of Mrs. Robinson "in a shamefully predatory manner, fleeced her assets, and willfully defied this Court's authority," and therefore, the motion to intervene was alternatively denied on the ground of unclean hands.

On February 2, 2022, Ms. Hicks filed a motion to reconsider denial of the motion to intervene and to strike a portion of the final order on the grounds of lack of jurisdiction and other reasons. She argued that the chancery court lacked jurisdiction over the real properties or the will, and she also argued that any issue regarding the validity of the will was not ripe until the death of the testator. After an additional hearing on February 18, 2022, the trial court denied the motion to reconsider or strike by order of March 15, 2022. The trial court found that a "motion to reconsider" was not properly before the court and that Ms. Hicks failed to demonstrate any basis for relief under Tennessee Rule of Civil Procedure 59 or 60. It reiterated its finding that Ms. Hicks was involved with the conservatorship proceeding "from the very beginning." The court found that the private attorney retained to represent Mrs. Robinson and oppose the conservatorship was "in effect" representing Ms. Hicks and acting in her interest, as Mrs. Robinson had not been competent to retain an attorney or assist in the representation. The court found it obvious that Ms. Hicks was the one coordinating with the attorneys and directing them. The court also noted that it had directed those attorneys to advise Ms. Hicks to hire her own counsel to represent her in the matter. It found that Ms. Hicks refused to return Mrs. Robinson to Tennessee even though she was the only person who could have facilitated her return. Thus, the court stated that Ms. Hicks was not a party to the conservatorship proceeding "by her own design" and that her "deliberate absence" did not deprive the court of the ability to decide the issues before it. The court found that there were no grounds for altering or setting aside the order denying intervention and that Ms. Hicks was barred from intervening on the basis of laches and unclean hands. The court noted that it had authorized the conservator to file the appropriate lawsuit to bring Ms. Hicks before the court to protect the assets of the ward. It also found that it had jurisdiction to decide the issues that it did regarding the property of the ward and her capacity.

On April 18, 2022, Ms. Hicks filed a motion to disqualify the chancellor in the separate lawsuit filed by the conservator against Ms. Hicks and her husband. She argued that a reasonable person with knowledge of all the facts could question whether Chancellor Thurman was impartial or had a personal bias or prejudice against her. Ms. Hicks stated that the second lawsuit was filed "at the request and direction of this court" in the conservatorship proceeding, citing the following portion of the court's August 17, 2021 order appointing the conservator:

> The Court finds that the actions of Donna Hicks were predatory and that this Court specifically authorizes the Conservator to take whatever steps as is

- 8 -

necessary toward prosecution or litigation to return the Respondent to Tennessee to her husband and family and to recover the Respondent's assets that have been taken from her.

In addition, Ms. Hicks quoted language from the transcript of the January 28, 2022 hearing on the motion to intervene and the February 18, 2022 hearing on the motion to reconsider. She argued that the trial judge had already "formed opinions about this litigant from a case wherein she was not a party" and that an ordinary person could conclude that he would not be impartial to Ms. Hicks in any future proceeding.

The motion to disqualify was not supported by an affidavit, nor did it state that it was not being presented for any improper purpose, as required by Tennessee Supreme Court Rule 10B.[1] As such, Ms. Hicks filed an amended motion to disqualify one month later, on May 23, 2022, with a supporting affidavit and the necessary language. At the hearing on the motion to disqualify, counsel for Ms. Hicks conceded that Chancellor Thurman did not have any outside knowledge about Ms. Hicks and that everything he had learned about her came from presiding over the conservatorship proceeding. Still, he insisted that recusal was necessary.

On June 28, 2022, the trial judge entered a written order denying the motion to disqualify. Chancellor Thurman noted that the information he had learned about Ms. Hicks was due to her involvement in the conservatorship proceeding and the proof at trial in that case. The court explained that the basis for the petition for a conservator was that Mrs. Robinson was "at risk of financial abuse by Donna Hicks," and, the court added, "that was borne out by the undisputed proof at trial and throughout the contested conservatorship proceeding." The chancellor explained that he was required to make findings of fact and conclusions of law based on the evidence and that he did so based on the proof at trial. He also noted that other statements made about Ms. Hicks "were made in the course of ruling on motions by Donna Hicks herself." The trial judge pointed out that a jury would be deciding the issues in the second lawsuit, and the trial judge would not sit as the fact finder other than in connection with his role as thirteenth juror. He said that he would consider the proof submitted in the second suit and make a determination based on the evidence, exercising his judicial functions fairly and impartially. "Separately and additionally," Chancellor Thurman found that the recusal motion was untimely because it relied on statements made at the end of trial on July 23, 2021, and at a hearing on January 28, 2022, yet the first motion to disqualify was not filed until April 18, 2022. As such, he found that Ms. Hicks had waived the right to question his impartiality regarding those facts because

---

[1] As stated in Rule 10B, a recusal motion "shall be supported by an affidavit under oath or a declaration under penalty of perjury on personal knowledge and by other appropriate materials." Tenn. Sup. Ct. R. 10B, § 1.01. "When a petitioner fails to support a motion with this mandatory affidavit or declaration under penalty of perjury, we have repeatedly held that the request for recusal was waived." *Moncier v. Wheeler*, No. E2020-00943-COA-T10B-CV, 2020 WL 4343336, at *3 (Tenn. Ct. App. July 28, 2020) (citing cases).

she did not file a motion promptly after learning of them.

Ms. Hicks timely filed a petition for an accelerated interlocutory appeal before this Court pursuant to Tennessee Supreme Court Rule 10B.

## II.  STANDARD OF REVIEW

This Court reviews the denial of a motion for disqualification or recusal under a de novo standard of review.  Tenn. Sup. Ct. R. 10B § 2.01.  The only issue we may consider in a Rule 10B appeal is whether the trial judge should have granted the motion for recusal. *Elseroad v. Cook*, 553 S.W.3d 460, 462 (Tenn. Ct. App. 2018); *Boren v. Hill Boren, PC*, 557 S.W.3d 542, 546 (Tenn. Ct. App. 2017).  We do not review the merits or correctness of the trial court's other rulings. *Duke v. Duke*, 398 S.W.3d 665, 668 (Tenn. Ct. App. 2012).

## III.  DISCUSSION

On appeal, Ms. Hicks maintains that Chancellor Thurman made statements during the course of the conservatorship proceeding that show a personal bias or prejudice against her, such that he must be recused in the second suit in order for her to have a fair trial.  She claims that Chancellor Thurman "has been prejudiced against [her]" and "has made his thoughts and feelings regarding Ms. Hicks abundantly clear . . . in various hearings and orders[.]"

The Tennessee Supreme Court recently summarized the standards that guide courts in a recusal case:

> "Litigants in Tennessee have a fundamental right to a 'fair trial before an impartial tribunal.'"  Holsclaw v. Ivy Hall Nursing Home, Inc., 530 S.W.3d 65, 69 (Tenn. 2017) (quoting State v. Austin, 87 S.W.3d 447, 470 (Tenn. 2002)); see Tenn. Const. art. VI, § 11 ("No Judge of the Supreme or Inferior Courts shall preside on the trial of any cause in the event of which he may be interested....").  Tennessee's Rules of Judicial Conduct require judges to "act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary," Tenn. Sup. Ct. R. 10, RJC 1.2, and to "uphold and apply the law, and ... perform all duties of judicial office fairly and impartially."  Tenn. Sup. Ct. R. 10, RJC 2.2.  Our rules define "impartiality" and "impartially" as the "absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintenance of an open mind in considering issues that may come before a judge."  Tenn. Sup. Ct. R. 10, Terminology "Impartial."
> Tennessee Supreme Court Rule 10, Code of Judicial Conduct, Canon 2, Rule 2.11, states that "[a] judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be

questioned." Bases for which a judge's impartiality might reasonably be questioned include, as are pertinent to this case, when the judge has "a personal bias or prejudice" against any of the parties, "personal knowledge of facts that are in dispute in the proceeding," has "served as lawyer in the matter in controversy, or was associated with a lawyer who participated substantially as a lawyer in the matter during such association," or has "served in governmental employment, and in such capacity participated personally and substantially as a lawyer or public official concerning the proceeding." Tenn. Sup. Ct. R. 10, RJC 2.11 (A)(1), (A)(6)(a) and (b).

"[T]he test for recusal is an objective one because the appearance of bias is just as injurious to the integrity of the courts as actual bias." State v. Cannon, 254 S.W.3d 287, 307 (Tenn. 2008) (citing Davis v. Liberty Mut. Ins. Co., 38 S.W.3d 560, 564 (Tenn. 2001)). Thus, the test for recusal requires a judge to disqualify himself or herself in any proceeding in which "a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." Id. (quoting Davis at 564); see also Clinard v. Blackwood, 46 S.W.3d 177, 187 (Tenn. 2001) ("[B]ecause judges have a privileged understanding of the legal system, they may fail to find an appearance of impropriety where one would be found by a layperson.").

*State v. Griffin*, 610 S.W.3d 752, 757-58 (Tenn. 2020).

As evidence of prejudice, Ms. Hicks relies on findings and statements made by Chancellor Thurman during the course of the conservatorship proceeding. She also argues that Chancellor Thurman has acquired "personal knowledge of facts that are in dispute in the proceeding" within the meaning of Rule 2.11. As such, it is helpful to review Tennessee caselaw regarding recusal in connection with prior litigation. We begin with the Tennessee Supreme Court's decision in *State v. Reid*, 213 S.W.3d 792 (Tenn. 2006), *abrogated on other grounds by State v. Miller*, 638 S.W.3d 136 (Tenn. 2021). In that case, the criminal defendant had committed similar murders at two fast food restaurants – a Captain D's and a McDonald's. *Id.* at 805-06. During his murder trial for the crimes at McDonald's, he moved for recusal "because the same trial judge had presided over the Captain D's trial," and therefore, the defendant argued that the trial judge was unable to impartially exercise her role as thirteenth juror in the second case and had an opinion prior to hearing the evidence. *Id.* at 815. The trial judge denied the motion, and the Tennessee Supreme Court affirmed. *Id.* at 815-16. It explained:

A trial judge is not disqualified because that judge has previously presided over legal proceedings involving the same defendant. *See State v. Hines*, 919 S.W.2d 573, 578 (Tenn. 1995) ("'A judge is in no way disqualified because he tried and made certain findings in previous litigation.'" (quoting *King v. State*, 216 Tenn. 215, 391 S.W.2d 637, 642

- 11 -

(1965))). Moreover, "[p]rior knowledge of facts about the case is not sufficient in and of itself to require disqualification." *Alley* [*v. State*, 882 S.W.2d 810, 822 (Tenn. Crim. App. 1994)].

*Id.* at 815. The defendant failed to establish that the trial judge's participation in the prior trial prevented her from exercising her role as thirteenth juror free from bias. *Id.* The Court explained that adverse rulings do not necessarily indicate bias or prejudice, and the comments the defendant cited as "other evidence of partiality" were deemed appropriate under the circumstances. *Id.* at 815-16.

The same principles are clearly illustrated in *State v. Wilson*, No. M2013-00306-CCA-10B-CD, 2013 WL 543862, at *1 (Tenn. Crim. App. Feb. 13, 2013), in which a defendant had separate trials for "felony first degree murder and especially aggravated robbery" and then for premeditated first degree murder. The defendant moved to recuse the trial judge from presiding over the second case on the basis that he had "made rulings and statements which indicated [he had] prejudged the Appellant's guilt in this case." *Id.* Specifically, the trial judge had ordered consecutive sentencing in the first case, finding that the defendant was "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." *Id.* The judge commented that "there was really absolutely no reason to take [the victim's] life" and that it was an execution-style homicide, indicating that "we need to keep Mr. Wilson incarcerated as long as possible to protect the public from further serious criminal conduct[.]" *Id.* The defendant argued that these comments "crossed the line from simply presiding over previous litigation, and demonstrated a prejudgment of the ultimate issue in this case, and a partiality against [him] that require its recusal from this case." *Id.* at *6. The trial judge denied the motion for recusal in the second case, and the appellate court affirmed. It explained:

> The Appellant asserts on appeal that the trial judge in this case will be unable to remain fair and impartial due, in part, to the general nature of these two cases. The unpleasant facts of a case, however, or even an unruly defendant, are not grounds, in and of themselves, for the recusal of a judge. If this were true, it would be virtually impossible for any trial judge to preside over a criminal case. The Appellant also attempts to equate a jury's potential inability to remain fair and impartial in the face of highly prejudicial or inflammatory evidence with a judge's duty to preside impartially over a trial. The two are simply not the same. Although the Appellant suggests it will be "impossible" for the trial court to hear the evidence in this case, having already heard the evidence in the previous case, without forming an opinion about the Appellant's guilt or innocence, that decision will ultimately be the jury's sole responsibility. The fact that the trial court presided over the Appellant's first case, which may share some similarities with the instant case and may even involve some of the same evidence, is not a basis for

recusal. *See Reid*, 213 S.W.3d at 815. Indeed, the trial court's knowledge of the facts of a case does not require disqualification. *See id.* The Appellant has not shown a reasonable basis for questioning the trial court's impartiality based upon the fact that it presided over the Appellant's previous trial.

*Id.* As for the specific comments previously made by the trial judge, the appellate court explained that "[a]ny comments made by the trial court must be construed in the context of all the facts and circumstances to determine whether a reasonable person would construe those remarks as indicating partiality on the merits of the case," and "if the basis for the comments stems from what the trial court learned during trial, recusal is not required." *Id.* at *7. Reviewing the trial judge's comments in light of the record, the appellate court concluded that the comments "were limited to the specific tasks [the court] was required to perform" in the case before it. *Id.* As such, they did not require recusal in the second case. *Id.* Simply put, "[t]he fact that a trial judge has previously presided over legal proceedings involving the same defendant does not establish bias." *State v. Foster*, No. E2011-00490-CCA-R3-CD, 2012 WL 1752390, at *11 (Tenn. Crim. App. May 17, 2012); *see, e.g.*, *State v. Parton*, 817 S.W.2d 28, 30 (Tenn. Crim. App. 1991) (affirming the denial of a recusal motion alleging that the trial judge could not be impartial because he had "sat on prior trials and hearings involving the appellant" and exhibited a "bad attitude against him in prior hearings").

Courts have reached similar results in civil matters more akin to the case before us. For instance, in *In re Bell*, 344 S.W.3d 304, 307 (Tenn. 2011), the Tennessee Supreme Court considered whether a trial judge violated the Tennessee Code of Judicial Conduct by hearing a civil case "without disclosing to a new party that he had previously made findings against the new party as to liability and damages" in a previous case. The proceedings involved an uninsured motorist who was not a party to the first suit but was named as a defendant in the second. *Id.* at 307-09. The trial judge "did not disclose to [the uninsured motorist] that he had previously heard testimony and made findings concerning the same accident" in the first case. *Id.* at 311. The Supreme Court considered whether the trial judge "should have recused himself from *Pleau II* solely on the basis that he decided *Pleau I* and failed to disclose that prior decision to Coleman," the uninsured motorist. *Id.* at 316. Canon 3(E)(1) stated, in pertinent part: "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: [] the judge has . . . personal knowledge of disputed evidentiary facts concerning the proceeding[.]" *Id.* at 312 n.8. However, the Tennessee Supreme Court found no basis for disqualification under these circumstances:

> To the extent that the Court of the Judiciary found that Judge Bell automatically should have recused himself from *Pleau II* solely on the basis that he decided *Pleau I* and failed to disclose that prior decision to Coleman, we disagree. Judges routinely hear the same matter on multiple occasions, for instance, when a case is non-suited or after the appellate court remands

the case. "A judge is in no way disqualified because he tried and made certain findings in previous litigation," *State v. Hines*, 919 S.W.2d 573, 578 (Tenn. 1995), and "the mere fact that a judge has ruled adversely to a party or witness in prior judicial proceedings is not grounds for recusal." *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 565 (Tenn. 2001). Therefore, a judge's prior decision in a case does not, in and of itself, make the judge prejudiced against any particular party, *including a party that enters the case for the first time following remand. Nor does the fact that the judge previously heard the case give the court "personal knowledge of disputed evidentiary facts concerning the proceeding."* Tenn. Sup. Ct. R. 10, Canon 3(E)(1)(a). Similarly, the history of the case does not qualify as "information ... the parties or their lawyers might consider relevant to the question of disqualification," *see* Tenn. Sup. Ct. R. 10, Canon 3(E)(1) cmt., at least insofar as that language assumes that such information is known only to the judge. The prior proceedings and court file are a matter of public record, and the fact that the new party may be unrepresented by counsel and thus fail to investigate the history of the case does not impose additional duties of disclosure, much less an obligation of disqualification, on the judge hearing the case. . . .

*Id.* at 316-17 (emphasis added).

Here, Ms. Hicks similarly argued that Chancellor Thurman had acquired "personal knowledge of facts that are in dispute in the proceeding." She complains about the fact that he has "ruled on the same subject matter in a different proceeding." However, "'[a] judge is not disqualified merely because he has previously presided at the trial of a case involving the same evidence and transaction.'" *King v. State*, 391 S.W.2d 637, 642 (Tenn. 1965) (quoting 30A Am. Jur. *Judges* § 186, pp. 95, 96). Moreover, "the mere fact that a judge has ruled adversely to a party or witness in a prior judicial proceeding is not grounds for recusal." *Davis*, 38 S.W.3d at 565; *see, e.g*, *Renner v. Renner*, No. E2019-01879-COA-T10B-CV, 2019 WL 7287159, at *1 (Tenn. Ct. App. Dec. 27, 2019) (affirming denial of a motion for recusal where the movant was "no stranger to the [chancery court]" and alleged "a lack of impartiality on the part of the chancellor presiding over [his] divorce case due to her knowledge of unrelated litigation in which the movant was a party"); *In re Est. of Miller*, No. E2018-00658-COA-T10B-CV, 2018 WL 1989610, at *2 (Tenn. Ct. App. Apr. 27, 2018) (finding no basis for recusal on remand where the only allegations of bias involved the trial judge's erroneous adverse rulings that led to reversal in the first appeal); *Elliott v. Elliott*, No. E2012-02448-COA-10B-CV, 2012 WL 5990268, at *4 (Tenn. Ct. App. Nov. 30, 2012) (observing that the mother's "grounds for recusal amount to arguing only that the Trial Court Judge made findings of fact and adverse rulings as to her in prior litigation," and "[t]hese allegations are insufficient, without more, to show that the Trial Judge is prejudiced against Mother and should be recused from her cases"); *Bailey v. Champion Window Co. Tri-Cities, LLC*, 236 S.W.3d 168, 171 (Tenn. Ct. App. 2007)

(finding no reasonable basis for questioning the trial judge's impartiality despite the fact that the trial judge had previously found a party in contempt in an unrelated case and that decision was reversed on appeal).

As specific additional evidence of prejudice in this case, the lengthy petition for recusal appeal filed by Ms. Hicks cites numerous statements made by Chancellor Thurman throughout the conservatorship proceeding. However, as noted by the Conservator in its response, Ms. Hicks did not cite all of these statements and rulings as evidence of bias in the short written recusal motion she presented to the trial judge. Rule 10B specifically provides that "[t]he motion shall state, with specificity, all factual and legal grounds supporting disqualification of the judge[.]" Tenn. Sup. Ct. R. 10B, § 1.01. We encountered the same situation in *Smith v. Daniel*, No. M2019-02083-COA-T10B-CV, 2019 WL 6825976, at *3 (Tenn. Ct. App. Dec. 13, 2019), in which the appellant attempted to raise "a host of additional arguments in her petition on appeal that were not presented in the recusal motion." We explained that this Court "must limit our review on appeal to the matters [the appellant] raised in her motion for recusal before the trial court." *Id. See In re Samuel P.*, No. W2016-01592-COA-T10B-CV, 2016 WL 4547543, at *3 n.3 (Tenn. Ct. App. Aug. 31, 2016) (declining to review additional rulings made by the trial judge over the course of the proceedings that allegedly demonstrated bias when the appellant discussed the rulings on appeal but did not include them in his recusal motion); *McKenzie v. McKenzie*, No. M2014-00010-COA-T10B-CV, 2014 WL 575908, at *6 n.3 (Tenn. Ct. App. Feb. 11, 2014) (declining to address additional allegations of bias raised in a petition to this Court but not in the motion for recusal presented to the trial judge because review under Rule 10B is limited to the trial court's denial of the recusal motion); *see also Adkins v. Adkins*, No. M2021-00384-COA-T10B-CV, 2021 WL 2882491, at *6 (Tenn. Ct. App. July 9, 2021) ("[T]he trial court first must be allowed under Rule 10B to decide whether to grant or deny a motion to recuse on all the grounds raised by the movant.") (internal quotation omitted).

In the motion for disqualification Ms. Hicks presented to Chancellor Thurman, she argued that "a reasonable person with knowledge of the facts and circumstances involved in this matter could question his impartiality and personal bias or prejudice against the Defendant, Donna Hicks." As factual background, she stated that the second lawsuit was filed "at the request and direction of this Court" in the conservatorship proceeding, and for support, she cited the following excerpt from the August 17, 2021 order appointing the conservator:

> The Court finds that the actions of Donna Hicks were predatory and that this Court specifically authorizes the Conservator to take whatever steps as is necessary toward prosecution or litigation to return [Mrs. Robinson] to Tennessee to her husband and family and to recover [her] assets that have been taken from her.

Read in context, however, we cannot say that the trial judge's comments would cause a reasonable person to conclude that he has an impermissible bias against Ms. Hicks. "'The purpose of a conservatorship is to protect the person and the property of a disabled person.'" *In re Lawton*, 384 S.W.3d 754, 761 (Tenn. Ct. App. 2012) (quoting *AmSouth Bank v. Cunningham*, 253 S.W.3d 636, 641 (Tenn. Ct. App. 2006)). Accordingly, the order continued:

> Though the Court is to consider family members under Tennessee Law in the appointment of a conservator, however, the Court hereby appoints the Upper Cumberland Development District, Office of the Public Guardian (UCDD/OPG), and its agents . . . not because Petitioners have done anything wrong but because the Court finds that the Public Conservator has the resources and is in the best position to get [Mrs. Robinson] home to her Tennessee family, other than Ms. Hicks and her immediate family, and to recover [Mrs. Robinson's] assets that have been taken from her by Ms. Hicks. All rights shall be removed from [Mrs. Robinson] and transferred to the Public Conservator as provided in T.C.A. § 34-3-107 *et seq.* . . .

The trial judge also stated during his oral ruling:

> I suspect that the Conservator will file an appropriate lawsuit to bring the daughter into this case. I'm – I'm going to keep the Public Conservator on this, not because I found that petitioners are inqualified [*sic*], but I think they're in a better situation right now to deal with this and if there's been moneys absconded with, they have the capabilities of moving forward, and if there needs to be prosecution, I think they can take whatever steps necessary. The Public Conservator has all the rights available under the statute.

This explanation of why the trial judge chose to appoint the public guardian as the conservator rather than Mr. Knowles, and its discussion of the conservator's authority, was appropriate considering the testimony of the corporate security investigator about the incidents that occurred in this case. In addition, the guardian ad litem had expressed concerns about criminal activity and informed the court that he had already been consulting with the Tennessee Bureau of Investigation and the Federal Bureau of Investigation, and he had set up a meeting with the District Attorney's Office. Again, "[a]ny comments made by the trial court must be construed in the context of all the facts and circumstances to determine whether a reasonable person would construe those remarks as indicating partiality on the merits of the case." *Wilson*, 2013 WL 543862, at *7. Although Ms. Hicks complains that Chancellor Thurman has "formed opinions about this litigant from a case wherein she was not a party," finding that she had unclean hands, took advantage of Mrs. Robinson, and acted in a "predatory" manner by "taking her mother's money," those were precisely the issues the trial court was required to consider and decide based on the

allegations, issues, and proof presented in the conservatorship proceeding.

Finally, we note that Ms. Hicks also cited statements made by Chancellor Thurman during the hearing on her petition to intervene, at which the trial judge also heard the motion to alter or amend filed by Mrs. Robinson's private attorney. According to Ms. Hicks, he recognized during that hearing that "another judge may need to hear the current matter." However, this is factually incorrect. Our review of the transcript does not reveal any such statement by Chancellor Thurman, nor do the statements he did make reflect an impermissible bias. The trial judge acknowledged that "[w]ills are normally to be proven up at the death of the person," and he acknowledged that the matter would normally be heard by the probate judge, but he noted that in DeKalb County, he served both as chancellor and as probate judge. He added, "*So if the Court of Appeals decides that that needs to be a later hearing, that's fine.* I don't think the Court can un-ring the bell based on what's happened already. *If the Court of Appeals decides I'm wrong on this*, then they need to designate and say that they need another judge to hear *the probate case*, because I'm going to have to ignore everything Ms. Hicks did that was improper in this case." (emphasis added). Chancellor Thurman's remarks regarding what might happen in "the probate case" regarding the will do not suggest an impermissible bias requiring disqualification in the case filed by the conservator against Ms. Hicks. Regarding that issue, Chancellor Thurman stated unequivocally that he could "exercise [his] judicial functions fairly and impartially" and that Ms. Hicks would "get a fair slate before this Court."

In conclusion, we recognize that "a judge should not decide to recuse unless a recusal is truly called for under the circumstances," as the judge "has as much of a duty not to recuse himself absent a factual basis for doing so as he does to step aside when recusal is warranted." *Anderson Lumber Co., Inc. v. Kinney*, No. E2016-01640-COA-T10B-CV, 2016 WL 6248597, at *4 (Tenn. Ct. App. Oct. 26, 2016) (quotations omitted). Chancellor Thurman properly denied the recusal motion because a person of ordinary prudence, knowing all the facts known to the judge, would not find a reasonable basis for questioning his impartiality. *See Griffin*, 610 S.W.3d at 762. Chancellor Thurman's statements and rulings in the conservatorship case do not require disqualification from presiding over the jury trial in the separate case filed against Ms. Hicks.[2]

### III. CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court denying the recusal motion and remand for further proceedings. Costs of this appeal are taxed to the appellant, Donna Hicks, for which execution may issue if necessary.

---

[2] Due to our resolution of the substantive issue, we do not reach Chancellor Thurman's alternative ruling that Ms. Hicks did not promptly seek recusal in this case.

- 17 -

_____
CARMA DENNIS MCGEE, JUDGE